**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, solely as Trustee for the SECURITIZED ASSET BACKED RECEIVABLES L.L.C. TRUST 2006-WM3, | : : : : : | |
| | : | CIVIL ACTION NO: |
| Plaintiff, | : : | |
| v. | : : | |
| WMC MORTGAGE. L.L.C., as successor-by-merger to WMC Mortgage Corp., and GENERAL ELECTRIC CAPITAL CORPORATION, | : : : : : | |
| | : | NOVEMBER 30, 2012 |
| Defendants. | : : | |

**COMPLAINT**

Plaintiff Deutsche Bank National Trust Company (the "Trustee" or "DBNTC"), solely in its capacity as trustee for the Securitized Asset Backed Receivables L.L.C. Trust 2006-WM3 (the "Trust"), for its complaint against WMC Mortgage L.L.C., as successor-by-merger to WMC Mortgage Corp. ("WMC"), and General Electric Capital Corporation ("GE Capital" and together with WMC, "Defendants") alleges upon information and belief as follows:

**NATURE OF THE ACTION**

1.      This is a case about Defendants' false representations and warranties regarding residential mortgage loans sold to a residential mortgage-backed securitization trust and Defendants' breach of their unambiguous contractual obligations to repurchase those defective loans from the Trust.  As a result of Defendants' false representations and

subsequent failure to abide by their contractual obligations, the Trust has been injured in an amount substantially in excess of $356 million.

## SUMMARY OF CLAIMS

2.      On or about December 1, 2006, WMC sold approximately 4,780 mortgage loans with an aggregate original principal balance of $998,949,119 to Securitized Asset-Backed Receivables, L.L.C. (the "Depositor"), which in turn sold the loans to the Trust as part of a securitization transaction.  Upon transferring the loans to the Trustee to hold on behalf of investors, and again in its capacity as a "Responsible Party" under the Pooling and Servicing Agreement ("PSA") that created the Trust, WMC made over 70 individual representations and warranties about the loans, including but not limited to:

- That the documents, instruments, and agreements submitted for loan underwriting were not falsified and contained no untrue statement or omission of material fact required to be stated therein;

- That all mortgage loans were underwritten in accordance with the underwriting guidelines;

- That all mortgages were to be used as the primary residence of the mortgagor, rather than rented to a third party, unless otherwise specified in the PSA;

- That the assets, loan history, income, and ability of any potential mortgagor would be properly documented;

- That the real estate underlying each mortgage was properly insured; and

- That any and all requirements of any federal, state, or local law had been met.

3.      A considerable number of the loans in the Trust have failed to perform.  In fact, the loan origination documents demonstrate that WMC or its affiliated mortgage originators routinely approved mortgage loans despite clear defects in the loan

applications and/or the loan-underwriting process.   These defects include WMC's repeated failure to adhere to its own underwriting practices, such as determining the borrower's ability to repay the loan.   WMC also misrepresented facts about the loans to borrowers and turned a blind eye to obvious warning signs of potential fraud on the part of borrowers, lenders, real estate agents, and other parties to loan transactions—all in breach of representations and warranties that WMC made in the PSA.

4.      Such practices constitute breaches of WMC's representations and warranties regarding the quality of loans it sold to the Trust.   These breaches have had a material and adverse effect on the value of the affected loans and/or the interests of the Trustee or the investors who hold investment interests in the Trust (known as "Certificateholders").   WMC also breached numerous representations and warranties it made in the PSA which are, by their terms, automatically deemed to be adverse and material—such as WMC's representation that the loans sold to the Trust complied with applicable underwriting guidelines.

5.      The PSA obligated WMC to give prompt written notice to the Trustee and the other parties to the PSA upon its discovery of a breach of any representation or warranty memorialized in the PSA.   WMC, as the originator of the defective mortgage loans, was the party best equipped to detect breaches of its own representations and warranties early in the life of the securitization.   Moreover, the blatant nature of some breaches discovered in a forensic review of the mortgage loan files was such that WMC must have known that the loans it originated were rife with breaches of representations and warranties.   Nevertheless, WMC never notified any party to the PSA of any breach.

6.      The PSA provides the Trustee a remedy for WMC's breaches even where, as here, WMC fails to proactively address defects in loans it originated.  Under Section 2.03(d) of the PSA, upon notice of a breach of a representation or warranty that materially and adversely affects the value of any loan or the interest of the Trustee or the Certificateholders therein, WMC has the opportunity to correct or cure the breach within a specified cure period.  If WMC fails to correct the breaches within that cure period for a particular loan, it must repurchase that loan from the Trust in the amount of the mortgage loan's unpaid principal balance, accrued interest on that balance, all expenses incurred by the Trustee in enforcing the repurchase obligation, and certain other costs or expenses.  If a representation automatically deemed adverse and material is breached, WMC must repurchase the affected loans for the same amount without any opportunity to cure the breach.  Pursuant to Section 2.03(h) of the PSA, WMC must further indemnify and hold harmless the Trustee for all costs, expenses, and losses incurred, including legal fees, resulting from WMC's breaches of its representations and warranties.

7.      On August 24, 2012, and again on September 19, 2012, the Trustee notified WMC that a forensic review of loan files for a subset of the mortgage loans in the Trust revealed that over 1,300 specific mortgage loans had breached one or more of WMC's representations and warranties; that those breaches materially and adversely affect the value of the loans or the interests of the Trustee or Certificateholders therein; and that WMC was therefore obligated to cure or repurchase those loans.  The Trustee's notifications also alerted WMC that statistical analysis demonstrated that WMC had likely committed material and adverse breaches of its representations and warranties affecting over 95% of the non-performing loans in the Trust.  The Trustee has thus

fulfilled all notice requirements under the PSA. WMC has nevertheless failed to cure the breaches or repurchase any defective loans. This failure constitutes a breach of the PSA.

8.      The Trustee now brings this action to enforce WMC's obligations under the terms of the PSA. WMC has committed material and adverse breaches of its representations and warranties, ignored its obligation to notify the Trustee upon WMC's own discovery of those breaches, refused to repurchase defective mortgage loans upon notice by the Trustee, and failed to indemnify the Trustee, all in breach of its express contractual obligations under the PSA. As a result, the Trustee is entitled to damages and specific performance.

## PARTIES

9.      DBNTC is a national banking association organized under the laws of the United States of America to carry on the business of a limited purpose trust company. DBNTC's main office is located at 2000 Avenue of the Stars, 9th Floor, North Tower, Los Angeles, California 90067 and its trust administration offices are located at 1761 East St. Andrew Place, Santa Ana, California 97025. DBNTC brings this action solely in its capacity as Trustee of the Trust, and not in its individual capacity.

10.      Pursuant to Section 2.01(a) of the PSA, the Trustee was conveyed "all the right, title and interest of the Depositor in and to the Trust Fund" for the benefit of the Certificateholders and as such has standing and authority to sue on the Trust's behalf.

11.      The Trustee commences this lawsuit upon the direction of certain Certificateholders pursuant to Article VIII of the PSA, and all conditions precedent to filing suit have been satisfied or deemed futile.

12.      Securitized Asset Backed Receivables L.L.C. Trust 2006-WM3 is a trust formed as of November 1, 2006 pursuant to the PSA. The Trust is a New York common

law trust created by written instruments, including the PSA, manifesting the express intention to create a trust and setting forth the subject, purpose and beneficiaries of the Trust. The Trustee brings this action pursuant to Federal Rule of Civil Procedure 17(a)(1)(E) as trustee of an express trust for the benefit of Certificateholders.

13. WMC is a limited liability company incorporated under the laws of the State of Delaware with its principal place of business in Woodland Hills, California. WMC's business is directed, controlled, and coordinated from the offices of its sole member, GE Capital, a Delaware corporation whose principal place of business is Norwalk, Connecticut.

14. WMC is the successor entity to WMC Mortgage Corp., which originated residential home mortgage loans. WMC Mortgage Corp. was licensed by the Connecticut Department of Banking from 1995 to 2007 as a Mortgage Lender/Broker and was registered with the Connecticut Secretary of State as a foreign corporation doing business in Connecticut.

15. GE Capital is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.

## JURISDICTION AND VENUE

16. Jurisdiction lies in this Court under 28 U.S.C. § 1332(d) and § 1348 because the parties are citizens of different States and because the amount in controversy exceeds $75,000, exclusive of interest and costs. Further, because an active controversy between the parties lies within this Court's jurisdiction, this Court has power under 28 U.S.C. § 2201(a) to issue a declaratory judgment establishing the rights and other legal relations of the Trustee and Defendants.

17.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1), § 1391(b)(2), and § 1391(c)(2) because Defendants reside within this judicial district and because, upon information and belief, a substantial part of the events and omissions giving rise to this cause of action occurred in the District of Connecticut.

## FACTUAL ALLEGATIONS

### I.     The Securitization of Mortgage Loans

18.     The Trust stands at the center of a mortgage-backed securitization—a heavily negotiated structured-finance transaction whereby mortgage loans are typically pooled and deposited into a Trust which serves as collateral for the issuance of securities, commonly called "certificates."  The certificates pay principal and interest from the cash flow generated by the mortgage loan pool.

19.     The Trust was formed with a pool of 4,780 residential mortgage loans. The Trust holds the mortgage loans for the benefit of the Certificateholders who purchased certificates in the Trust.  The value of the mortgage loans—and, by extension, the certificates—depends upon the quality of the individual mortgage loans within the loan pool.

20.     The securitization at issue here resulted from a series of coordinated transactions.  Initially, WMC, a mortgage originator, sold a bundle of mortgage loans to Sutton Funding, L.L.C., the "Sponsor," through a series of purchase agreements.  The mortgage loans at issue in this action are those that WMC sold to the Sponsor and were ultimately conveyed to the Trust (the "WMC Mortgage Loans").

21.     The Sponsor then agreed to sell and convey the WMC Mortgage Loans to the Depositor.  In turn, the Depositor conveyed the WMC Mortgage Loans to the Trustee for the benefit of the Certificateholders.

II.    **The Pooling and Servicing Agreement**

22.    The PSA for the Trust is dated "as of" November 1, 2006, with a defined "Closing Date" of December 1, 2006.  A copy of the PSA and its relevant exhibits is attached to this Complaint as Exhibit A, and incorporated herein by reference.

23.    The PSA created the Trust and empowered the Trustee to hold assets for the benefit of the Certificateholders.  The Trustee is a party to the PSA not in its individual capacity, but solely as Trustee for the Trust.  WMC is a party to the PSA and is designated a "Responsible Party" thereunder.

24.    The PSA, attached to the Complaint as Exhibit A-1, sets forth the obligations of the various parties to the agreement.  As described below, WMC made extensive representations and warranties in the PSA and obligated itself therein to clearly defined remedies in the event of any breach of those representations and warranties.

A.    WMC's Representations and Warranties

25.    WMC's many broad representations and warranties in the PSA regarding the WMC Mortgage Loans were an inducement to the sale of those loans to the Trust.  In making these representations and warranties, WMC assured the various participants in the securitization—including the Trustee and the Certificateholders—that WMC alone would bear the risk that any of the loans failed to adhere to minimum quality standards.

26.    WMC's representations and warranties are set out in full in Schedules III and IV to the PSA and incorporated into the terms of the agreement pursuant to Section 2.03(b) of the PSA.[1]  Pursuant to Section 2.03(b) of the PSA and the relevant Schedules,

---

[1] A copy of Schedule III to the PSA is attached to this Complaint as Exhibit A-2.  A copy of Schedule IV is attached as Exhibit A-3.

WMC made its representations and warranties "as of the Closing Date," which is defined

in the PSA as December 1, 2006.  WMC represented and warranted, among other things:

- "WMC Mortgage Corp. has delivered to the Purchaser the Data Tape Information and that Data Tape Information and the information set forth on the Mortgage Loan Schedule . . . are true and correct" (Schedule III(a));

- "No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of WMC in connection with the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan. . . . No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place on the part of any Person (other than Seller), including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan.  WMC has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein" (Schedule III(m));

- "No Mortgage Loan has an LTV or CLTV[2] greater than 100%" (Schedule III(q));

- "As of the WMC Servicing Transfer Date, other than payments due but not yet 30 days or more delinquent, there is no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note" (Schedule III(s));

- "[Each] Mortgage Loan was underwritten in accordance with the Underwriting Guidelines" (Schedule III(x)); and

- "No predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay . . . were employed in the origination of the Mortgage Loan" (Schedule III(ddd)); and

---

[2] "LTV," or "loan-to-value," is the ratio of the loan the borrower owes compared to the value of the property mortgaged.  "CLTV" or "combined loan-to-value" is the ratio of *all* of the borrower's loans to the value of his property.  LTV and CLTV are commonly used proxies for the possibility that a mortgagor might default.

- "WMC's decision to originate any mortgage loan or to deny any mortgage loan application is an independent decision based upon the Underwriting Guidelines" (Schedule IV(g)).

27.     Several of WMC's representations and warranties are expressly designated "Deemed Material and Adverse Representations," meaning that a breach of any one of them would *automatically* be considered material and adverse to the value of the Mortgage Loan and the interests of the Trustee and Certificateholders therein.   These deemed-adverse representations include the following:

- "Any and all requirements of any federal, state, or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, disclosure and all predatory, abusive and fair lending laws applicable to the Mortgage Loan, including, without limitation, any provisions relating to the Prepayment Penalty, if any, applicable to such Mortgage Loan, have been complied with" (Schedule III(g));

- "The methodology used in underwriting the extension of credit for each Mortgage Loan does not rely on the extent of the related Mortgagor's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria that related such facts as, without limitation, the Mortgagor's credit history, income, assets or liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan's originator made a reasonable determination that at the time of origination the Mortgagor had the ability to make timely payments on the Mortgage Loan.   Such underwriting methodology confirmed that at the time of origination (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan." (Schedule III(lll)).

All in all, WMC made over 70 separate representations and warranties regarding the WMC Mortgage Loans.  WMC thus repeatedly promised to the various participants in the securitization, including the Trustee and the Certificateholders, that the WMC Mortgage Loans met certain essential criteria directly pertinent to the quality of those loans.  Moreover, the representation contained in Schedule III(lll), a "Deemed Material and

Adverse Representation," placed the burden on WMC of employing accurate investigation and analysis to verify each borrower's credit, history, employment, and ability to repay the mortgage she proposed to borrow. WMC's representations and warranties were central components of the securitization.

       B.    <u>WMC's Notice, Repurchase, and Indemnification Obligations</u>

       28.    WMC's representations and warranties were so central to the bargain struck in the PSA that the parties agreed to various contractual mechanisms and remedies to assure the parties that WMC would bear the risk that any of the WMC Mortgage Loans did not conform to its own representations and warranties.

       29.    WMC's obligations to cure or repurchase defective loans are triggered by "discovery" of a breach or receipt of the Trustee's "notice" that a breach has occurred. PSA § 2.03(c)-(d). Because WMC originated the WMC Mortgage Loans, WMC is the party best equipped to "discover" the existence of breaches, even in the absence of notice from the Trustee. Thus, in the event that WMC discovered *any* breach of its representations and warranties—regardless of whether such breach had any material or adverse affect—the PSA obligated WMC to "give prompt written notice" to the Trustee and the other parties to the PSA. PSA § 2.03(c).

       30.    Section 2.03(d) of the PSA provides that, within 60 days of discovery by, or notice to, WMC that a WMC Mortgage Loan does not satisfy a representation or warranty, WMC must "use its best efforts to cause to be remedied a material defect in a document constituting part of a Mortgage File or promptly to cure such breach in all material respects and, if such defect or breach cannot be remedied," to either (1) "remove such Mortgage Loan from the Trust Fund and substitute in its place" a substitute loan

conforming to the representations and warranties, or (2) repurchase that loan at a contractually defined "Repurchase Price." PSA § 2.03(d).

31.     The PSA defines the "Repurchase Price" for any defective mortgage loan as the sum of the unpaid principal balance of the defective mortgage loan, accrued interest on such unpaid principal balance, all expenses incurred by the Trustee in enforcing the repurchase obligation, and other specified costs and expenses. PSA Art. I at 45.

32.     A more expedited remedy exists for breaches of representations and warranties that are "Deemed Material and Adverse." Under § 2.03(d) of the PSA, the Trustee "shall give notice of such breach to the Responsible Party and request the Responsible Party to repurchase the Mortgage Loans at the Repurchase Price within sixty (60) days." PSA § 2.03(d). This expedited remedy gives WMC *no* opportunity to cure a breach before repurchase is necessary.

33.     Under either remedy, the PSA provides that WMC must repurchase or cure the loans for which its breach materially and adversely affects the value of any Mortgage Loan or the interests of the Trustee or the Certificateholders in the loan, and does not require any showing that WMC's breach caused any realized loss in the related loan in the form of default or foreclosure.

34.     Section 2.03(h) of the PSA further requires that WMC "shall indemnify the Depositor, any of its Affiliates, the Servicer, the Trustee, and the Trust and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses . . . resulting from a third party claim, demand, defense or assertion based or grounded upon,

or resulting from, a breach by the Responsible Party of any of its representations and warranties or obligations contained in this Agreement."

35.     These notice, repurchase and indemnification obligations ensure that WMC, and not the Trust, would bear the economic consequences associated with WMC's breaches of its representations and warranties, thereby placing that risk squarely on WMC itself.

## III.     WMC's Breaches of its Representations and Warranties

36.     On August 24, 2012, the Trustee sent a letter to WMC (the "August 24 Demand Letter") that notified WMC that WMC had breached one or more of its representations and warranties with respect to 372 WMC Mortgage Loans with an aggregate original principal balance of $81,610,769, and that those breaches materially and adversely affect the value of the loans and the interests of the Trustee and the Certificateholders therein.   The Trustee further notified WMC that several such loans contained breaches of "Deemed Material and Adverse" representations and warranties that were not subject to cure under § 2.03(d) of the PSA.

37.   Those breaches were identified based upon the results of a forensic and statistical review of the loan files underlying the WMC Mortgage Loans.   The forensic review was performed by an industry-recognized firm (the "Re-Underwriting Firm") with specialized expertise in re-underwriting mortgage loans to assess their compliance with applicable underwriting guidelines and other requirements, such as the representations and warranties WMC made regarding the quality of its Mortgage Loans.   As part of that forensic review, the Re-Underwriting Firm employed the services of an industry-recognized economics and statistical consulting firm (the "Statistical Analyst").

38.    The Re-Underwriting Firm and the Statistical Analyst examined loan files for a sample of 405 of the WMC Mortgage Loans selected randomly from the more than 2,700 non-performing loans in the Trust with available loan files (the "Subject Loans"). Following its forensic review, the Re-Underwriting Firm identified 372 defective loans for which WMC had committed one or more material and adverse breaches of its representations and warranties.

39.    The Statistical Analyst then analyzed the sample reviewed by the Re-Underwriting Firm to estimate the breach rate for the entire population of the Subject Loans.  Using generally accepted statistical methods, the Statistical Analyst estimated that 97.1% of the Subject Loans were in material and adverse breach of one or more of WMC's representations and warranties.  The August 24 Demand Letter thus put WMC on notice that it had materially and adversely breached its representations and warranties as to nearly all of the non-performing loans in the Trust.

40.    The results of the forensic review were summarized and attached to the August 24 Demand Letter.  These summaries identified each individual breach, identified which loans were associated with each breach, and articulated how the breaches materially and adversely affect the value of the defective loans and the Trustee's or Certificateholders' interests therein.

41.    The Trustee explicitly demanded in the August 24 Demand Letter that WMC repurchase the 372 specified defective loans—as well as any other defective WMC Mortgage Loans—at the contractually defined Repurchase Price, and that WMC indemnify the Trustee for its losses.

42.     On September 19, 2012, the Trustee sent WMC a second repurchase demand (the "September 19 Demand Letter") notifying WMC that the Trustee had discovered material and adverse breaches of one or more representations and warranties for an additional 980 defective WMC Mortgage Loans.  Like the previous notice to WMC, the September 19 Demand Letter attached details of the forensic review conducted upon the relevant loan files by the Re-Underwriting Firm.  Those details included enumeration of each individual breach, the loan associated with that breach, and the reasons why each breach materially and adversely affects the value of the defective loans or the Trustee's or Certificateholders' interests therein.  Several breached representations and warranties, such as WMC's duty to use objective, accurate factors in the loan-approval process, *see* Schedule III(lll) of the PSA, were "Deemed Material and Adverse Representations" triggering WMC's automatic duty to repurchase such defective loans.

43.     The aggregate original principal balance of all defective loans noticed to WMC in the August 24 and September 19 Demand Letters exceeded $390 million.  The September 19 Demand Letter reiterated the Trustee's request that WMC repurchase all defective loans at the contractually agreed Repurchase Price and indemnify the Trustee for all costs and expenses incurred as a result of the breaches.

44.     The material and adverse breaches identified by the Trustee and detailed in the Trustee's August 24 and September 19 Demand Letters (and the exhibits thereto) include the following:

45.     **<u>Misrepresentation of Income and Assets:</u>**  Misrepresentations of a borrower's income and assets directly impinge upon the borrower's ability to repay the

- 15 -

mortgage.  Breaches arising from a misrepresentation of income or assets adversely affect the value of a mortgage loan because, among other things, they reveal that the borrower never had sufficient means to repay the loan.  The following are a few of many examples of breaches relating to misrepresentation of income or assets:

- "Loan A":[3]  The loan application stated that borrower was a truck driver and reported a monthly income of $12,000.  That income is twice the 75th percentile for truck drivers as measured by the Bureau of Labor Statistics, which estimates the average truck driver's salary in the borrower's region at $5,456 per month.  Independent investigation confirmed that the borrower's employment and income were misrepresented, and given the borrower's actual income, he could not possibly meet the required monthly payments to keep his mortgage current.  These misrepresentations triggered material and adverse breaches of multiple WMC representations and warranties.  Moreover, the degree of income misrepresentation was so blatant that WMC must have been aware of such breaches.

- "Loan B":  The loan application stated that borrower earned a monthly income of $9,700 as a self-employed tailor.  Later bankruptcy filings confirm that the borrower neither owned a business nor had any income at all.  These discrepancies constituted material and adverse breaches of multiple WMC representations and warranties and put WMC on notice of those breaches.

- "Loan C":  Borrower, a butcher, claimed a monthly income of $7,339.  A review of relevant records revealed the alteration of 24 months' worth of bank statements to inflate borrower's apparent income.  Post-closing tax returns revealed that the borrower in fact earned $1,267 per month.  These circumstances constituted material and adverse breaches of multiple WMC representations and warranties and put WMC on notice of those breaches.

- "Loan D":  The loan application claimed that borrower, a maid, earned a monthly income of $8,000 per month.  That stated income far exceeds 125% of the 75th percentile of monthly wages for comparable employment in the borrower's geographical region.  In fact, bankruptcy papers filed by the borrower revealed a monthly income of

---

[3] The materials sent by the Trustee to WMC with the August 24 and September 19 Demand Letters identified the mortgage loans described here by their actual loan numbers.  Those loan numbers have been omitted here in order to protect the confidentiality of individual borrowers.

only $1,583 per month. The vastly overstated income not only caused multiple material and adverse breaches of WMC representations and warranties, but also put WMC on notice of those breaches.

46.     **Failure to Verify Employment History**:     The following are a few of many mortgages where WMC breached its obligation to verify the employment history of potential borrowers, imposing a risk of borrower nonpayment on the Trustee and the Certificateholders:

- "Loan E": The loan application claimed that borrower was a self-employed landscaper with a monthly income in excess of $9,000. The origination credit report did not reflect that borrower had ever been self-employed and instead listed his employment as a cook, information that was corroborated by borrower's 2005 and 2006 tax returns. A verbal verification of the borrower's self-employment indicated that borrower's purported business phone number was unlisted. The credit report, the unlisted "business" phone number, and the unreasonably high income claimed for that business put WMC on notice of potential misrepresentation, failure to meet employment requirements, and noncompliance with the underwriting guidelines, all of which triggered material and adverse breaches of WMC representations and warranties.

- "Loan F": The loan application reported both employment and self-employment by borrower as an Industrial Mechanic, for a total reported income of $15,000 per month. The loan file also contained employment reference letters from three companies to verify borrower's self-employment. Public records indicate that, in fact, none of the three companies listed on the reference letters existed, and the phone numbers listed for those companies were in fact either personal cell phone or residential numbers. The borrower's later bankruptcy filings indicate that he was never self-employed during the time period relevant to his mortgage application. These facts indicate misrepresentation, failure to meet employment requirements, and noncompliance with the underwriting guidelines that trigger multiple material and adverse breaches of WMC representations and warranties and put WMC on notice of those breaches.

- "Loan G": The loan application stated that borrower owned a catering company and earned $6,900 per month. Public records reveal that the borrower lacked a state-required license for a catering business. The borrower's tax returns, contained in the loan file, indicated that she was in fact an unemployed housewife. These facts indicate

misrepresentation, failure to meet employment and income requirements, and noncompliance with underwriting guidelines, all of which triggered material and adverse breaches of WMC representations and warranties. Furthermore, information in the loan file itself, as well as readily available public records, would have alerted WMC to these breaches.

47. **Undisclosed Debt:** The following are a few of many mortgages where WMC breached its obligation to consider a potential borrower's credit history as part of its loan-approval process, directly imposing the risk upon the Trustee and Certificateholders that borrowers could not timely repay their loans:

- "Loan H": WMC wholly failed to investigate critical entries in the borrower's origination credit report, including 35 recent credit inquiries. In fact, the borrower had taken out four other mortgages worth about $800,000 in the three months before WMC approved the subject loan. Moreover, investigation revealed that the borrower did not live in the property he mortgaged with WMC. These indicators of misrepresentation, excessive debt, insufficient credit history, and noncompliance with underwriting guidelines triggered multiple material and adverse breaches of WMC representations and warranties.

- "Loan I": WMC failed to investigate numerous credit inquiries on the borrower's credit report that indicated possible interest by the borrower in purchasing property from additional third parties. WMC thus failed to learn that the borrower had taken out another mortgage just weeks before the WMC loan's closing date. These circumstances suggest misrepresentation; they also establish excessive debt levels, insufficient credit history, and noncompliance with underwriting guidelines, all of which triggered material and adverse breaches of WMC representations and warranties and put WMC on notice of those breaches.

## IV. WMC Breaches Its Notice, Repurchase, and Indemnification Obligations

48. As illustrated by the examples above, the documentation of and circumstances surrounding the WMC Mortgage Loans raised many flags of fraud and other underwriting errors that must have been obvious to WMC as the originator of the loans. Upon information and belief, discovery will uncover additional evidence that

WMC was on notice that it breached many of its representations and warranties at or near the time of the Closing Date. Nevertheless, WMC has never issued written notification to the Trustee, pursuant to Section 2.03(c) of the PSA, that it had discovered *any* breach of its representations and warranties.

49.     The PSA entitles the Trustee to insist that WMC repurchase the defective loans pursuant to either the "cure and repurchase" remedy or the "expedited repurchase" remedy. The Trustee issued repeated written notices to WMC informing it of its obligations under both remedies.

50.     In its August 24 letter to WMC, the Trustee explicitly "demand[ed] that [WMC] (1) Repurchase the Breaching Loans at the Repurchase Price, PSA § 2.03(d); (2) Repurchase the Breaching Subject Loans at the Repurchase Price, PSA § 2.03(d); [and] (3) Indemnify the Trustee for the costs and expenses (including the cost of the loan reviews and legal costs) resulting from [WMC]'s breach of the representations and warranties in the PSA. PSA § 2.03(h)."

51.     Once again, in the September 19 letter to WMC, the Trustee demanded, "pursuant to § 2.03 of the PSA," that WMC "(1) Repurchase the Breaching Loans at the Repurchase Price, PSA § 2.03(d)" and "(2) Indemnify the Trustee for the costs and expenses (including the cost of the loan reviews and legal costs) resulting from [WMC]'s breach of the representations and warranties in the PSA. PSA § 2.03(h)."

52.     The Trustee's notices satisfied the notice provisions of the cure and repurchase remedy set forth in Section 2.03(d) of the PSA requiring that WMC be provided notice of the discovery of any breach of representations and warranties and given an opportunity to cure that breach within 60 days.

53.    The 60-day period for WMC to cure the defective loans identified in the Trustee's August 24, 2012 demand letter elapsed on October 23, 2012.  The 60-day period for WMC to cure the defective loans identified in the Trustee's September 19, 2012 demand letter expired on November 18, 2012.

54.    To date, WMC has not cured or repurchased any of the defective loans identified by the Trustee.  Moreover, to the Trustee's knowledge, WMC has failed to investigate the breaches referenced in the Trustee's demand letters and has ignored evidence long in its possession confirming that such breaches have occurred, and that far more than the 1,352 specifically identified loans are defective, all in violation of its obligations under the terms of the PSA.

55.    WMC's refusal to cure or repurchase any of the defective loans is consistent with Defendants' publicly stated policy to, in all cases, "refute every loan" when presented with a repurchase demand.  Specifically, Mark Begor, the President and CEO of GE Capital Real Estate, which manages Defendants' handling of loan repurchase demands, publicly boasted to investors on a conference call that "[i]f you've seen some of our results you know that we refute every loan."

56.    Defendants have also failed to indemnify the Trustee or the Trust for expenses resulting from demands made upon the Trustee by Certificateholders to compensate them for losses grounded upon WMC's breaches of its repurchase obligation and its representations and warranties.

57.    The Trustee, the Trust, and the Certificateholders have all incurred legal fees, costs and expenses resulting from WMC's breach of both its representations and warranties and its contractual obligation to repurchase defective loans.  The Trustee

expects such expenses to accrue as long as Defendants remain in breach of their obligations.

## V.      WMC Is An Alter Ego of GE Capital

58.     WMC has operated as GE Capital's subprime lending arm and does not have an identity separate from GE Capital.  As WMC's CEO, Laurent Bossard, testified to the United States Senate Committee on Banking, Housing, and Urban Affairs on March 22, 2007, "GE Money made the decision post-acquisition to place WMC's mortgage operations under federal regulation.  This was accomplished by bringing the mortgage business under GE Money's Federal Savings Bank."

59.     WMC shared offices in Burbank, California with GE Capital's consumer-finance division.  The two purportedly separate companies operated out of the same offices throughout the relevant period surrounding the facts alleged in this Complaint. WMC's employees were also GE Capital employees.

60.     The fused identities of WMC and GE Capital carried through to the companies' product line.  On July 15, 2005, WMC launched a program called "WMC Select," which was said to allow "greater flexibility in qualifying the borrower for a loan since the borrower selects the loan features most important to him."  Notably, WMC stated in a June 29, 2007 SEC filing that "WMC Select is offered by GE Money Bank."

61.     WMC and GE Capital presented themselves to the world as one entity, with GE Capital providing financial backing for WMC.  For example, at an American Securitization Forum presentation in 2007, WMC distinguished itself from its competition by citing its "GE Support," which provided WMC access to GE Capital's

"institutional resources and balance sheet."  WMC further pitched itself as having "GE purchase power."

62.    As of January 1, 2007, WMC assigned substantially all of its mortgage origination operations, including its broker relationships, to GE Capital's GE Money Bank and transferred all of its employees to WMC-GEMB Mortgage Corp., a wholly owned operating subsidiary of GE Money Bank.  On January 2, 2007, GE Money Bank commenced doing business as "WMC Mortgage" and began originating and acquiring mortgage loans.

63.    GE Capital's restructuring and reorganization of WMC resulted in the ostensible transfer of WMC's repurchase and indemnification obligations to the new, undercapitalized WMC Mortgage, L.L.C.

64.    The core strategic decisions concerning GE Capital's WMC business continued to be made by GE Capital.  For example, on an investor conference call, Mark Begor (President and CEO, GE Capital Real Estate and GE Capital Restructuring Operations) discussed GE Capital's reserves for "potential future repurchases that may come from investors from loans that we have sold in the past."  Mr. Begor explained that GE Capital—controlling WMC's business—"put in a new leadership team," and was now "no longer underwriting to Wall Street guidelines," but "to our guidelines."

65.    Over the last few years, GE Capital's public statements have indicated that it is aware that GE Capital is ultimately responsible for WMC's repurchase and indemnification obligations arising out of WMC's subprime mortgage origination business.  As stated above, GE Capital's Mark Begor said to investors in regards to loan repurchase demands asserted against WMC that "[i]f you've seen some of our results you

know that we refute every loan, and we've had a success rate of defending that claim in GE's favor at well over 80%, close to 84%."

66.      In addition, GE Capital stated in its SEC disclosures that soon after folding WMC into GE Money Bank, GE Capital sold its WMC mortgage business in the fourth quarter of 2007.  In referring to this sale, GE Capital informed the SEC that "[u]pon sale, we retained contractual obligations to repurchase previously sold loans as to which there was an early payment default or with respect to which certain contractual representations and warranties were not met."

67.      In recognition of Defendants' repurchase and indemnification obligations arising out of the WMC representations and warranties, GE Capital continues to record reserves on its consolidated balance sheet for repurchase requests based upon pending and estimated future loan repurchase requests.

68.      When asked on an October 15, 2010 GE earnings call about indications on GE's 10-Ks that "you do actually retain some sort of obligation for liabilities or loans previously sold" by WMC, Keith S. Sherin, Vice Chairman and CFO of GE, did not dispute GE's retention of WMC's repurchase obligations.

69.      Today, GE Capital's WMC mortgage business is being wound down, and Defendants are responsible for responding to repurchase demands.  The decision not to fulfill Defendants' repurchase and indemnification obligations was made by GE Capital from its Connecticut headquarters.

## CLAIMS FOR RELIEF

### First Cause of Action
**(Breach of Contract—Breach of WMC Representations and Warranties)**

70.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 69, inclusive, of this Complaint as if fully incorporated herein.

71.     The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

72.     WMC, in its capacity as a Responsible Party under the PSA, made certain representations and warranties concerning the condition of WMC Mortgage Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid.  These representations and warranties were made by WMC to the Trustee, which acts under the PSA for the benefit of the Certificateholders.

73.     The Trustee has performed the obligations under the PSA required to bring suit and has not excused the performance by WMC of any of its obligations under the PSA.

74.     WMC has breached its representations and warranties with respect to the WMC Mortgage Loans held by the Trust.  WMC's breaches of representations and warranties have materially and adversely affected the value of the mortgage loans and the Trustee's and Certificateholders' interests in the WMC Mortgage Loans within the meaning of Section 2.03 of the PSA.

75.     Pursuant to Section 2.03 of the PSA, upon notice by any other party to the PSA that a breach of a representation or warranty has been discovered with respect to a WMC Mortgage Loan, WMC is obligated to cure such breach within 60 days.  Failure to

cure such breach within 60 days results in WMC's obligation to repurchase the defective loan at the contractually defined Repurchase Price.

76.     Pursuant to the Trustee's notices sent to WMC on August 24 and September 19, 2012, the Trustee notified WMC under the PSA that WMC had breached its representations and warranties with respect to the WMC Mortgage Loans, and that those breaches materially and adversely affect the value of the mortgage loans or the interest of the Trustee or the Certificateholders therein.

77.     WMC failed to cure any of its breaches of representations and warranties within the 60-day period prescribed by the PSA and has further failed to repurchase any loan for which it has breached representations and warranties.

78.     With respect to breaches of "Deemed Material and Adverse Representations," WMC has an absolute obligation to repurchase the defective loans without any cure period.  WMC has not repurchased any WMC Mortgage Loans.

79.     Section 2.03 of the PSA provides that the remedy for breaches of representations and warranties is for WMC to cure or repurchase all defective loans for the Repurchase Price specified in the PSA.

80.     Plaintiff is, therefore, entitled to an order of specific performance requiring WMC to repurchase all defective loans at the Repurchase Price for which the Trustee has given WMC notice pursuant to Section 2.03(d) of the PSA.  To the extent that WMC is not currently obligated to repurchase all WMC Mortgage Loans, the Trustee reserves the right to seek repurchase of additional mortgage loans based on discovery, investigation, and further forensic analysis of loan files for other mortgage loans held in the Trust.

81.     WMC's breaches of representations and warranties were grossly negligent given WMC's systematic failure to adhere to minimal underwriting standards or to verify basic and critical information about potential mortgage borrowers.

82.     As a direct and proximate cause of WMC's breaches of its representations and warranties, the Trust has suffered and continues to suffer significant damages.

83.     Defendants are liable for WMC's breaches of its representations and warranties.

**Second Cause of Action**
**(Breach of Contract—Breach of WMC Repurchase Obligations)**

84.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 83, inclusive, of this Complaint as if fully incorporated herein.

85.     The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

86.     WMC, in its capacity as a Responsible Party under the PSA, made certain representations and warranties concerning the condition of the WMC Mortgage Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid.

87.     WMC has breached its representations and warranties with respect to the WMC Mortgage Loans held by the Trust.   WMC's breaches of representations and warranties have materially and adversely affected the value of the Trustee's and Certificateholders' interests in the WMC Mortgage Loans within the meaning of Section 2.03 of the PSA.

88.     Pursuant to Section 2.03 of the PSA, upon notice by any other party to the PSA that a breach of a representation or warranty has been discovered with respect to a WMC Mortgage Loan, WMC is obligated to cure such breach within 60 days.   Failure to

cure such breach within 60 days results in WMC's obligation to repurchase the defective loan at the contractually defined Repurchase Price.

89.     Pursuant to the Trustee's notices sent to WMC on August 24 and September 19, 2012, the Trustee notified WMC under the PSA that it had breached its representations and warranties with respect to the WMC Mortgage Loans, and that those breaches materially and adversely affect the value of the mortgage loans or the interest of the Trustee or the Certificateholders therein.

90.     WMC failed to cure any of its breaches of representations and warranties within the 60-day period prescribed by the PSA and has further failed to repurchase any loan for which it has breached representations and warranties.  Those failures constitute further breaches of WMC's obligations under the PSA.

91.     With respect to breaches of "Deemed Material and Adverse Representations," WMC has an absolute obligation to repurchase the defective loans without any cure period.  WMC has not repurchased any WMC Mortgage Loans.  That failure constitutes a further breach of WMC's obligations under the PSA.

92.     The Trustee has performed the obligations under the PSA required to bring suit and has not excused the performance by WMC of any of its obligations under the PSA.

93.     WMC's breaches of its repurchase obligations have materially and adversely affected the value of the Trustee's and Certificateholders' interests in the WMC Mortgage Loans within the meaning of Section 2.03 of the PSA.

94.     Plaintiff is, therefore, entitled to an order of specific performance requiring WMC to repurchase all defective loans at the Repurchase Price for which the

Trustee has given WMC notice pursuant to Section 2.03(d) of the PSA. To the extent that WMC is not currently obligated to repurchase all WMC Mortgage Loans, the Trustee reserves the right to seek repurchase of additional mortgage loans based on discovery, investigation, and further forensic analysis of loan files for other mortgage loans held in the Trust.

95.    WMC's breaches of its repurchase obligations were grossly negligent given its failure to repurchase over 1,300 mortgage loans where the Trustee explicitly informed WMC in detail about defects in those loans.

96.    As a direct and proximate cause of WMC's breaches of its repurchase obligation, the Trust has suffered and continues to suffer significant damages.

97.    Defendants are liable for WMC's breaches of its repurchase obligation.

### Third Cause of Action
**(Breach of Contract—Failure to Notify)**

98.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 97, inclusive, of this Complaint as if fully incorporated herein.

99.    The Trust is governed by the terms of the PSA, a valid and binding contract to which the Trustee and WMC are parties.

100.    WMC, in its capacity as a Responsible Party under the PSA, made certain representations and warranties concerning the condition of the WMC Mortgage Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid.

101.    Under Section 2.03(c) of the PSA, WMC, as Responsible Party, was required to give prompt written notice to the Trustee upon discovery of a breach of any of these representations and warranties.

102.    Upon information and belief, WMC discovered that the WMC Mortgage Loans breached WMC's representations and warranties, but failed to give prompt written notice of any breaches to the Trustee.  WMC thereby breached its obligations to the Trustee under the PSA.

103.    The Trustee has performed the obligations under the PSA required to bring suit and has not excused the performance by WMC of any of its obligations under the PSA.

104.    The Trust, the Trustee, and Certificateholders have been damaged by WMC's failure to provide prompt written notice of breaches of WMC's representations and warranties.

105.    Plaintiff is entitled to recover damages for the losses caused to the Trust, the Trustee, and Certificateholders by WMC's failure to provide prompt written notice upon discovery of breaches of its representations and warranties.

106.    Defendants are liable for WMC's failure to provide prompt written notice upon discovery of breaches of its representations and warranties.

**Fourth Cause of Action**
**(Breach of Contract—Breach of WMC Indemnification Obligations)**

107.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 106, inclusive, of this Complaint as if fully incorporated herein.

108.    WMC breached its representations and warranties and repurchase obligations under the PSA, and those breaches have materially and adversely affected the value of the related WMC Mortgage Loans and the value of the interests under the PSA of the Trustee and the Certificateholders.

109.    In Section 2.03(h) of the PSA, WMC agreed to indemnify the Trust and the Trustee against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any third party claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach by WMC of its obligations under the PSA and the representations and warranties WMC made therein.

110.    The Certificateholders have suffered substantial losses as a result of WMC's breaches of its representations and warranties and its repurchase obligations.  A group of Certificateholders has thus demanded that the Trustee enforce the rights of the Trust, the Trustee, and the Certificateholders under the PSA.  The Trustee has incurred substantial legal fees, losses, and related costs in investigating, reviewing, and prosecuting its demand for relief from Defendants as a result of the Certificateholders' demand.

111.    WMC has breached its indemnification obligations by failing to indemnify the Trustee and the Trust for these costs and expenses, including the cost of loan reviews and legal costs, resulting from WMC's breaches of its representations and warranties and its repurchase obligations.

112.    As a direct and proximate cause of WMC's breaches of its indemnification obligations, the Trustee and the Trust have suffered and continue to suffer significant damages.

113.    Defendants are liable for WMC's breaches of its indemnification obligations.

## PRAYER FOR RELIEF

WHEREFORE, the Trust, acting through the Trustee, respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

(1)     Declare that Defendants have breached their representations and warranties and their repurchase obligations with respect to each of the WMC Mortgage Loans, including but not limited to each of the mortgage loans specifically identified in the August 24 and September 19 repurchase demands;

(2)     Enter an order of specific performance requiring Defendants to repurchase each of the WMC Mortgage Loans, including but not limited to each of the mortgage loans specifically identified in the August 24 and September 19 repurchase demands, at the contractually defined Repurchase Price;

(3)     Issue a permanent injunction requiring Defendants to repurchase each of the WMC Mortgage Loans, including but not limited to each of the mortgage loans specifically identified in the August 24 and September 19 repurchase demands, at the contractually defined Repurchase Price;

(4)     Award damages against Defendants in an amount to be determined at trial but in no event less than $356 million;

(6)     Award indemnification for the legal fees, losses, and other costs and expenses incurred by the Trust and the Trustee; and

(7)     Award such further relief as this Court deems just and proper.

Respectfully submitted,

PLAINTIFF DEUTSCHE BANK
NATIONAL TRUST COMPANY,
SOLELY AS TRUSTEE FOR THE
SECURITIZED ASSET BACKED
RECEIVABLES L.L.C. TRUST 2006-WM3

By: /s/ Thomas D. Goldberg
    Thomas D. Goldberg (ct 04386)
    DAY PITNEY LLP
    One Canterbury Green
    201 Broad Street
    Stamford, Connecticut 06901
    Tel.: (203) 977-7300
    Fax: (203) 977-7301
    tgoldberg@daypitney.com

    Of Counsel

    MOLO LAMKEN LLP

    Steven F. Molo
    Justin V. Shur
    540 Madison Avenue
    New York, NY 10022
    Tel.: (212) 607-8160
    Fax: (212) 607-8161

    *Its Attorneys*